UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| JACOB ZACHARY JACOBSON,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | 1:13-CV-01008-CBK<br><br><br>OPINION AND ORDER<br>ON SOCIAL SECURITY APPEAL |

Plaintiff brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of defendant's final decision denying plaintiff's claim for disability insurance benefits. I have conducted a *de novo* review of the record. I find that the Commissioner's decision is not supported by substantial evidence on the record as a whole.

## BACKGROUND

Plaintiff was operating a motor vehicle at 40 miles per hour when he hit an unmarked standing train car at an intersection in Grant County, South Dakota, on January 6, 2008. He was 36 years old and, prior to the accident, worked in the construction industry as a heavy equipment operator for 18 years.

As a result of the accident, plaintiff sustained lacerations to his hand and forehead and fractured ribs. Plaintiff also complained of pain in his neck, left hip, and ankles. During examinations conducted soon after the accident it was determined that he had a prior fractured hip, bulging discs in his cervical spine, and bone spurs in his left right ankle, none of which were acute or caused by the accident. He did have swelling and spurring at the Achilles tendon in his right ankle. He previously suffered from asthma which, together with the broken ribs, caused difficulty breathing. He was initially seen in the emergency room in Milbank, South Dakota, but was transferred to Sanford USD Medical Center in Sioux Falls the day following the accident.

Plaintiff suffered an extensive area on the back of his left hand where the skin was missing and the muscle and fascia were showing. A plastic surgeon operated on the hand the day

after the surgery to remove glass fragments and close the wound. Plaintiff was released from the hospital on January 9, 2008.

On January 11, 2008, plaintiff sought treatment from Dr. Calvin Roseth at the Sanford clinic in Watertown, South Dakota. He complained of left hip pain. Dr. Roseth prescribed Vicodin and Tramadol.

On January 16, 2008, plaintiff was treated by Dr. William F. Bell at Sanford Orthopedics and Sports Medicine in Sioux Falls, South Dakota. He was walking with a cane and complained of pain. He told Dr. Bell he was then being treated with Norco (Hydrocodone) for pain. His request for OxyContin was denied and instead he was referred to physical therapy.

Two days later, on January 18, 2008, plaintiff complained to Dr. Roseth of left hip pain. He was given Vicoden for pain. On January 28, 2008, he again reported to Dr. Roseth complaining of pain. He was again given Vicodin along with Ultram. Dr. Roseth noted that he would not give plaintiff narcotic pain medicine and that all narcotic medicine should be managed by Dr. Bell.

On February 4, 2008, plaintiff complained to Dr. Bell of pain in his left hip, leg, calf, and thigh and requested narcotic pain medication. His request was denied but he was prescribed Tramadol. Dr. Bell ordered more x-rays to determine whether some subtle injury could account for the pain. The next day he called in to complain that his pain medication was not working. He was advised again that no narcotic pain meds would be dispensed. Dr. Bell's office consulted with Dr. Roseth and learned that plaintiff had a prior history of substance abuse.

On February 6, 2008, plaintiff contacted Dr. Roseth again, seeking a refill of Vicodin. Dr. Roseth reminded him that he would not prescribe narcotics and that any further narcotic refills would have to be prescribed by Dr. Bell.

On February 8, 2008, plaintiff again presented to Dr. Roseth complaining that the Tramadol was not controlling his pain. Plaintiff was again instructed that any narcotic pain relief would have to be prescribed by Dr. Bell. Dr. Roseth increased plaintiff's Tramadol prescription.

On February 25, 2008, plaintiff complained to Dr. Bell of pain. An MRI of the ankle was scheduled. On March 10, 2008, plaintiff was still complaining of pain rated, by him, at a level seven on a ten point scale. Dr. Bell told plaintiff he was concerned about how quickly plaintiff used the pain medicine. An MRI revealed a fractured right ankle and plaintiff elected to treat the injury surgically. He underwent surgery to his right ankle on March 18, 2008, to remove a bone

2

fragment and was prescribed OxyContin and Lortab for pain. By March 26, 2008, he had little pain but was using a cane. He had taken himself off the OxyContin and was only using Lortab for pain.

On April 7, 2008, Dr. Bell removed the staples in plaintiff's ankle. Plaintiff was still experiencing pain which he rated at 6-7 on a ten point scale but he was walking normally. Physical therapy was ordered and he was released to perform sedentary work.

Plaintiff began physical therapy on April 15, 2008. On April 18, 2008, he reported that he intended to report to his work site next week to attempt to work.

On April 16, 2008, plaintiff presented to Dr. Devine in Watertown, complaining of pain. He had just started physical therapy. Plaintiff reported to Dr. Devine that he has been on Vicodin and that Dr. Bell "thought that it would be easier for him to get his pain pills here in Watertown." Dr. Devine wrote a new prescription for Vicodin. On April 28, 2008, plaintiff called Dr. Devine's office inquiring if he could have a higher dose of Vicodin. He reported that he just went back to work as a heavy equipment operator. Plaintiff was prescribed Voltaren and Ultram in additional to the prior dose of Vicodin. On May 1, 2008, he called Dr. Devine's office complaining that the pain medicines were not working. He was advised to make an appointment and he was seen the same day. He complained to Dr. Devine that his hip pain is worse and that he has constant right ankle and left wrist pain. Sitting in the heavy equipment made the pain worse. Dr. Devine prescribed Percocet. On May 5, 2008, he called, reporting that Oxycodone (Percocet) works but makes him sleepy. His Vicodin prescription was increased.

On May 12, 2008, Dr. Bell's notes state that plaintiff was still having a fair amount of pain but had returned to work operating heavy equipment.

On June 2, 2008, Dr. Devine ordered a refill for Vicodin. On June 17, 2008, Dr. Devine prescribed Hydrocodone.

On July 1, 2008, plaintiff called Dr. Devine's office, complaining of hip and ankle pain. He stated that the Hydrocodone was not working and requested different pain medication. He was prescribed OxyContin. On July 7, 2008, he called Dr. Devine's office reporting that he was on Oxycodone but it made him sleepy and dizzy and he was unable to use it while working. On July 25, 2008, he requested a refill of the Hydrocodone which was ordered by Dr. Devine.

In early August 2008, plaintiff was seen at the Human Services Agency in Watertown where he had received mental health treatment prior to the accident. The treating physician

3

noted that he had a history of amphetamine induced mood and cocaine dependence. He was diagnosed with major depressive disorder, generalized anxiety disorder, and polysubstance abuse and dependence. His stressors included declining physical health as a result of the January automobile accident.

On August 7, 2008, plaintiff sought a second opinion from Dr. Steven Feeney at Johnson Memorial Health Services in Dawson, Minnesota. Significant ankle pain occurred when operating the pedals and sitting caused hip pain, resulting in him quitting his job. Dr. Feeney suggested plaintiff stay on his pain medication but noted that he had developed a tolerance to the Norco. Dr. Feeney recommended a hip replacement and noted that plaintiff winces in pain when he walks.

In late August 2008, plaintiff consulted with Dr. Anthony Nwakama at Johnson Memorial Health Services in Dawson, Minnesota, for hip pain. At that time he was using Vicoden for pain and occasionally using a cane to walk. Dr. Nwakama noted plaintiff had an abnormal gait. Plaintiff was diagnosed with severe degenerative arthritis in his left hip which was described as "bone on bone" arthritis. Hip replacement was recommended despite plaintiff's young age.

Plaintiff filed for disability benefits in September 2008, claiming an onset date of January 6, 2008.

On October 7, 2008, Dr. Feeney noted plaintiff has knee pain as well as hip pain. Pain medicine tolerance was discussed as well as the probability that he will need rehab detoxification following his hip surgery because he has been on pain medications so long. Dr. Feeney prescribed Oxycodone and Vicodin. On October 9, 2008, Dr. Feeney ordered x-rays and an MRI of the left knee. The tests were normal. Dr. Feeney reviewed the MRI results with plaintiff on October 15, 2008. He opined that the knee pain is a result of the way plaintiff is walking and suggested strengthening exercises. He prescribed a two week supply of Oxycodone but did not refill the Vicodin because plaintiff had not exhausted his previous supply.

Plaintiff saw Dr. Feeney again on October 31, 2008, and plaintiff's pain was better managed. Dr. Feeney again noted that they would have to watch his pain medication withdrawal symptoms following surgery. Dr. Feeney continued to dispense pain medications at two-week intervals.

On November 18, 2008, plaintiff had a preoperative evaluation with Dr. Feeney. He followed up with Dr. Feeney on December 9 and December 31, 2008.

Plaintiff underwent a left hip replacement in January 2009. Five days later, on January 23, 2009, he saw Dr. Feeney. He was using a walker and was in severe pain. Dr. Feeney put him on Oxycodone and Vicodin and discussed the possibility that plaintiff may need inpatient treatment to wean off the pain medication once his pain subsides. Two weeks later, he had a post-operative follow up with Dr. Nwakama. He reported that he has been on Oxycodone and Vicodin for pain control which was being managed by Dr. Feeney. He was walking with a cane. Although he complained of pain at a level seven on a ten point scale, he was seen to have a normal gait.

On February 2, 2009, Dr. Feeney's notes indicate that plaintiff's hip pain had subsided but he still had knee pain and was walking with a cane. He was given a two week supply of Oxycodone with a plan to start weaning him off those medications. He was continuing physical therapy. On February 13, 2009, Dr. Feeney noted that plaintiff was using fewer pain medications. He was walking with a cane. Dr. Feeney decreased the strength of the pain medications. On February 25, 2009, Dr. Feeney again reduced plaintiff's pain medications but gave him a 30 day supply.

In March 2009, he had a follow up mental health appointment with no change in his diagnosis or his stressors. On March 23, 2009, he saw Dr. Feeney. He had pain in his hip, right knee, and wrist. Dr. Feeney scheduled him for physical therapy.

On April 8, 2009, plaintiff again saw Dr. Nwakama. He complained of hip pain at a level of one. Upon examination, he had normal range of motion without pain, normal gait, and "he moves about the room easily." He was given instruction for range of motion exercises and advised to follow up in one year.

On April 13, 2009, plaintiff told his pharmacist that all his medications were stolen in Sioux Falls. The pharmacy contacted Dr. Devine's office who had not seen plaintiff since May 2008. Dr. Devine's office noted that plaintiff would have to receive his medications from Dr. Feeney. Plaintiff contacted Dr. Feeney's office, requesting refills due to the theft. No refills were prescribed.

Plaintiff saw Dr. Feeney on April 20, 2009, at which time he noted that his hip and knee pain had subsided. He was worried about having to do planting on his father's farm because he

was having significant pain in his ankle. Dr. Feeney continued to lower the doses of pain medication. On May 18, 2009, Dr. Feeney noted plaintiff had back pain which he believed was caused by the way plaintiff was walking. He was also having ankle pain. Nonetheless, Dr. Feeney continued to wean plaintiff off the pain medications.

Plaintiff saw Dr. Feeney on June 16, 2009, complaining of left hip and low back pain which increased upon moving around or doing exercises. Sitting on a riding lawn mower exacerbated the pain. Dr. Feeney filled plaintiff's Oxycodone and Hydrocodone prescriptions.

Plaintiff did not show up for a June 29, 2009, appointment with Dr. Devine. He saw Dr. Feeney on July 13, 2009. He was limping and using a cane. He had been doing work blading roads which caused him back spasms and pain. Dr. Feeney refilled his prescriptions for pain medications and referred him to Dr. Nwakama.

On July 20, 2009, plaintiff saw Dr. Devine for chronic pain. He refilled plaintiff's Ocycontin and Oxycodone prescriptions. On July 25, 2009, he called Dr. Devine's office, requesting a refill of his Hydrocodone prescription, which was done.

On August 5, 2009, plaintiff presented to Dr. Nwakama complaining of pain in the right ankle, both knees, and right hip which are worse with sitting and walking. He reported that he had active prescriptions for OxyContin and Oxycodone. His right ankle range of motion was minimal and caused pain. The x-rays revealed mild degenerative joint disease of the right ankle and he was diagnosed with osteoarthritis. Plaintiff planned to consult with Dr. Feeney who had been managing his pain medications.

On August 7, 2009, plaintiff saw Dr. Feeney with complaints of low back, hip, and ankle pain at a level eight. He was walking with a crutch and a noticeable limp. Dr. Feeney refilled his pain medications.

On August 19, 2009, Dr. Feeney, whose medical record showed that he was then affiliated with the Prairie Lakes Healthcare System in Watertown, reviewed MRI and x-rays of plaintiff's lumbar spine. He found a mild disc bulge at L3-L4. Also on that date, Dr. Mark Vossler at the Sanford Clinic in Duele County referred plaintiff to Dr. John Hansen at the Sanford Pain Center in Sioux Falls.

Plaintiff's chief complaint to Dr. Hansen was pain in his left wrist, knee, and hip as well as low back and right ankle and knee pain. He related that he could not work which was depressing. He complained that, after the hip replacement, everything else started hurting. At

that time he reported doing occasional pickup work for friends operating heavy equipment but would like to work full time. Dr. Hansen advised him to refrain from the use of marijuana, continue to see Dr. Hansen, and see a chemical dependency counselor. He was prescribed Oxycodone CR and Oxycodone/APAP.

On August 28, 2009, plaintiff saw Dr. Feeney to go over the results of the MRI. He was using a cane and walking with a noticeable limp and complained of back, right knee, right ankle, and wrist pain at a level 7-8. Plaintiff did not request any pain pill refills. Dr. Feeney instead prescribed Lyrica.

Plaintiff saw Dr. Hansen on September 2, 2009. He complained that he cannot put weight on his right ankle, has constant low back pain, suffers shooting pains in his pelvis, has stabbing pain under the left kneecap over half the time upon weight bearing, and that he gets awakened by knee, wrist, back, and pelvis pain. He was noted to use a cane and have an asymmetrical gait. Dr. Hansen opined that the biggest problem was the ankle pain which caused an asymmetrical gait which in turn caused abdominal and low back pain. He prescribed an orthotic, the use of a four-wheel walker, crutches and walking sticks, and recommended plaintiff undergo counseling. He was prescribed a 30 day supply of Oxycodone.

When he next saw Dr. Hansen on September 28, 2009, plaintiff related that he had increased his Oxycodone dose from once every eight hours to once every six hours which had helped. No change in prescription was ordered.

At an October 13, 2009, visit with Dr. Hansen, Dr. Hansen noted that plaintiff had failed to follow through with mental health and chemical dependency appointments and had failed to bring his opiates for a count at the last two meetings. Plaintiff reported right ankle and hip pain as well as low back and pelvis pain, all at level seven or above.

Plaintiff underwent a mental health evaluation in support of his disability claim on October 19, 2009, at the Human Services Agency. The examiner noted that plaintiff has major depressive disorder and generalized anxiety disorder which are chronic but improve with medication compliance.

On November 2, 2009, Dr. Devine noted that plaintiff had been discharged from the pain clinic in Sioux Falls and he would no longer fill plaintiff's pain medication. This record makes little sense because the records show that plaintiff continued to treat with Dr. Hansen although he had been discharged from physical therapy due to not showing up for appointments.

A mental functional capacity assessment was completed on November 5, 2009. The medical consultant opined that plaintiff's allegations of depression which is increased by pain and work are "partially credible." From a mental health view point, the consultant opined that plaintiff could do basic routine work tasks.

A physical functional capacity assessment was completed on November 6, 2009. Dr. Frederick Entwistle opined that plaintiff has a medically determinable impairment but that his complaints of pain "are markedly disproportionate compared to the objective findings on review of his medical records" and that "he is not a credible medical historian." Dr. Entwistle never actually saw plaintiff.

On November 30, 2009, plaintiff saw Dr. Hansen. Plaintiff explained that he had been terminated from physical therapy for no-shows and would like to return. He described that he could only sit or stand "for so long." Dr. Hansen referred plaintiff to physical therapy, increased his Oxycodone CR dose, and stopped Oxycodone/APAP.

On November 16, 2009, plaintiff's disability claim was denied.

On December 2, 2009, plaintiff was re-evaluated by his physical therapist. He complained of sharp, stabbing, aching pain in the ankle, both knees and in the hip. He advised that he was on OxyContin and allergy medications. He related that he was working off and on running a backhoe. He began weekly physical therapy sessions during which he complained of pain in his low back and down the left leg. He also complained of pain in the left knee, hip, groin, and left ankle. The therapist noted that plaintiff was unable to tolerate most exercises without pain. On March 15, 2010, he reported that he would be going to Hawaii for a month to work for a friend. No further medical visits were planned.

Plaintiff was seen at the Human Services Agency in Watertown on January 6, 2010. At that time he was only on mental health medications. He complained that he had not been able to work as he has in the past and this was frustrating as he has a strong work ethic.

Plaintiff saw Dr. Hansen on February 2, 2010. Dr. Hansen was under the impression that plaintiff's pain was not adequately controlled. He planned to continue to see plaintiff once a month and increased his Oxycodone prescription. On March 16, 2010, plaintiff told Dr. Hansen that his pain was at a level eight and that his physical therapy seems to make things worse. He related that doubling his dose of Oxycodone helped quite a bit. Dr. Hansen increased his

Oxycodone prescription. He was advised to discontinue physical therapy and to return to the pain clinic upon his return from Hawaii.

Plaintiff called Dr. Hansen from Hawaii to report that his pain medication had been stolen. Dr. Hansen was unable to prescribe the medications from outside Hawaii. Plaintiff reported that he subsequently found the medication. He returned from Hawaii and saw Dr. Hansen on April 26, 2010, when he reported that his pills were stolen from his truck on April 23, 2010. It does seem frankly strange that plaintiff's medications were stolen twice. Dr. Hansen gave plaintiff two week prescriptions and tapered down the dose. Plaintiff thereafter followed up with Dr. Hansen on May 10, 2010, at which time trigger point injections were ordered.

Plaintiff was evaluated by a physical therapist at Sanford USD Medical Center Outpatient Rehabilitation on April 26, 2010. He was found to have moderate to major lumbar range of motion loss, significant loss of hip extension range of motion, gross range of motion loss in the left hip in all directions, and gross range of motion loss in the right ankle. Plaintiff's left leg was longer than his right when lying down. The treatment plan included achieving a symmetrical pelvis and a functional gait.

On May 24, 2010, plaintiff received trigger point injections by Dr. Malcolm Sanders at the Sanford USD Medical Center in Sioux Falls. He saw Dr. Hansen on June 7, 2010, who was of the opinion that two days pain reduction as a result of the injections was a diagnostic success.

On June 21, 2010, Dr. Hansen noted that plaintiff was more engaged in treatment. His earlier assessment that a lack of engagement was attributable to chemical dependency or medication diversion was replaced with a conclusion that he was earlier operating within his emotional capability.

Plaintiff was discharged from physical therapy on July 6, 2010. The therapist noted that plaintiff had made minimal progress and had poor compliance with therapy.

Plaintiff saw Dr. Hansen on July 14, 2010. Trigger point injections were planned.

The medical records show that plaintiff counseled with Tandra Baker at Tapestry of Wellness in Sioux Falls for chronic pain and depression between November 2009, and August 2010. On August 20, 2010, plaintiff underwent an evaluation of mental impairments for his disability claim at Tapestry of Wellness in Sioux Falls. This type of evaluation would not meet the federal agency's requirements as to being an acceptable medical source.

9

On August 16, 2010, plaintiff received a left SI injection from Dr. Sanders and saw Dr. Hansen. He was also scheduled to see a physical therapist that day.

On August 24, 2010, DuPuy Orthopaedics, Inc. issued a recall of the hip replacement system which had been implanted in plaintiff.

Plaintiff saw Dr. Hansen on September 13, 2010 and discussed a recent injection in the SI joint.

On September 14, 2010, Dr. Kevin Whittle reviewed plaintiff's case and affirmed the residual functional capacity assessment dated November 6, 2009. He did not actually see plaintiff.

Plaintiff's disability claim was denied on reconsideration on September 16, 2010.

Plaintiff saw Dr. Hansen on October 18, 2010. They discussed plaintiff's inability to consistently follow through with medical and counseling appointments due to finances. They also discussed plaintiff seeing Dr. Timothy Walker to discuss action on the recalled hip replacement. No change in medications was ordered.

Plaintiff presented to Dr. Feeney on November 15, 2010, concerning the fact that the replacement hip had been recalled. He asked for a referral to Dr. Walker at Sanford and that was done. Plaintiff was having significant pain and walked with a noticeable limp. Plaintiff noted that Dr. Hansen had been managing his pain medications from Sioux Falls but he wanted Dr. Cook from Brookings to take over because of the distance. Plaintiff did not ultimately attend the scheduled appointment with Dr. Cook but continued to see Dr. Hansen.

Plaintiff saw Dr. Hansen on December 15, 2010. Dr. Hansen increased his Oxycodone dose.

On January 17, 2011, plaintiff was evaluated by Dr. Feeney. Dr. Feeney reviewed plaintiff's symptoms and the medications he was taking for pain, depression, allergies, and hypertension. Dr. Feeney suggested that plaintiff follow up with him periodically to make sure his was being compliant with the various doctors treating him.

Dr. Hansen wrote to plaintiff's attorney on February 15, 2011, informing that employment has been fundamentally problematic since the accident. Plaintiff prefers to work and has done some work but tolerated it "quite poorly." His left hip remains problematic, his degenerative right ankle makes weight-bearing fundamentally problematic and routine wrist manipulations, as are fundamental to driving heavy equipment, have not been well tolerated.

10

Plaintiff saw Dr. Hansen on February 16, 2011. Dr. Hansen impressed upon him the importance of a team approach to pain management, including seeing mental health and pain management counselors. A plan to see Dr. Timothy Walker for injections was also discussed.

Plaintiff Saw Dr. Feeney on March 29, 2011. Dr. Feeney reviewed the many medications plaintiff was prescribed and noted that no changes were suggested.

Plaintiff hired Brad Runia of OccuPro from Ortonville, Minnesota, to conduct a functional capacity assessment. The assessment was completed on April 5-6, 2011. Runia found that plaintiff was unable to tolerate or perform forward bending-standing, crouching, or kneel-half kneel. He had limited tolerance for standing work, elevated work, waist to crown lifting, front carry, stairs, ladder, and walking.

Plaintiff saw Dr. Hansen on April 12, 2011, at which time Dr. Hansen noted plaintiff looked much better. He had been following through with mental health and pain management counseling.

On May 11, 2011, plaintiff saw Dr. Hansen and received a trigger point injection in the knee from Dr. Walker.

On June 7, 2011, plaintiff was evaluated by Rick Ostrander of MVR Consulting Services. Ostrander issued a vocational evaluation report on August 11, 2011, opining that plaintiff had suffered a reduction in employability and labor market access of 94%. Ostrander stated that plaintiff was limited to sedentary work which generally requires a four year degree but plaintiff is not a good candidate for such training.

On March 21, 2011, plaintiff saw Dr. Feeney. Plaintiff received a trigger point injection in the hip on June 22, 2011, from Dr. Walker. He saw Dr. Hansen on June 29, 2011, to follow up with on a June 23, 2011, MRI. Dr. Hansen increased his Oxycodone prescription. He also saw Dr. Hansen on July 18, 2011 prior to receiving a trigger point injection in his S-spine. Dr. Hansen discussed plaintiff's one breach of his controlled substances agreement when he obtained Oxycodone from Dr. Devine in October 2010.

On July 25, 2011, plaintiff saw Dr. Feeney to review an MRI. He was noted to have chronic back, hip, and ankle pain and walked with a limp. The MRI was the same as the prior spinal MRI, noting a bulging disc in the lumbar spine.

11

On August 8, 2011, plaintiff saw Dr. Hansen as a follow up to the trigger point injections. Dr. Hansen subsequently contacted Dr. Devine, seeking assistance in controlling plaintiff's high blood pressure.

Plaintiff had a hearing before the ALJ on August 10, 2011, which was accomplished by a video hookup with the ALJ in Denver.

On September 7, 2011, Dr. Hansen did a follow-up from two acupuncture treatments. Plaintiff was continuing to see a mental health therapist. Dr. Hansen ordered no change In the Oxycodone pain regimen and instructed plaintiff to see him monthly.

On September 16, 2011, the ALJ denied plaintiff's claim for disability. The Appeals Council, after reviewing additional evidence, denied plaintiff's request for review on January 25, 2013. Thus, the decision of the ALJ is deemed the final decision of the Commissioner. Phillips v. Colvin, 721 F.3d 623, 625 (8th Cir. 2013). Plaintiff filed the instant appeal in federal district court.

## DECISION

An individual is considered to be disabled if, *inter alia*, he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). *Accord*, Bernard v. Colvin, 744 F.3d 482, 486 (8th Cir. 2014). An individual shall be determined to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Act." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Judicial review of the Commissioner's decision that claimant has failed to establish by a preponderance of the evidence that he is disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole. Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might find it adequate to support the Commissioner's conclusions." Draper v. Colvin, ___ F.3d ___, 2015

WL 871789 (8th Cir. 2015) (internal quotations omitted). "We consider both evidence that detracts from the ALJ's decision, as well as evidence that supports it, but we will not reverse simply because some evidence supports a conclusion other than that reached by the ALJ." McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (internal citations omitted). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, the court must affirm the [ALJ's] decision." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

The ALJ used the familiar five-step sequential evaluation to determine disability:

> In step one, the ALJ decides whether the claimant is currently engaging in substantial gainful activity; if the claimant is working, he is not eligible for disability insurance benefits. In step two, the ALJ determines whether the claimant is suffering from a severe impairment. If the claimant is not suffering a severe impairment, he is not eligible for disability insurance benefits. At the third step, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in Appendix 1 of the regulations (the "listings"). If the claimant's impairment meets or equals one of the listed impairments, he is entitled to benefits; if not, the ALJ proceeds to step four. At step four, the ALJ determines whether the claimant retains the "residual functional capacity" (RFC) to perform his or her past relevant work. If the claimant remains able to perform that past relevant work, he is not entitled to disability insurance benefits. If he is not capable of performing past relevant work, the ALJ proceeds to step five and considers whether there exist work opportunities in the national economy that the claimant can perform given his or her medical impairments, age, education, past work experience, and RFC. If the Commissioner demonstrates that such work exists, the claimant is not entitled to disability insurance benefits.

McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011) (internal C.F.R. citations omitted).

The ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since January 6, 2008, the date of the accident. At step two, the ALJ determined that plaintiff's asthma, post-surgical hip and ankle conditions, lumbar back stenosis, depression, and anxiety caused significant limitations on his ability to perform basic work activities. At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment. At step four, the ALJ determined that plaintiff was unable to perform his past relevant work as a heavy equipment operator and construction worker. The ALJ determined at step five that plaintiff has the residual functional capacity to perform a full range of light work and such work exists in significant

numbers in the national economy. In making that determination, the ALJ rejected plaintiff's reported limitations, finding them inconsistent with the objective findings in the record.

## I. Credibility.

The ALJ did not find the plaintiff's claims regarding the extent of his limitations to be credible.

> Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing the reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors." Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998).

Burress v. Apfel, 141 F.3d 875, 880-81 (8th Cir. 1998). "Polaski requires the ALJ to consider: (1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. Baumgarten v. Chater, 75 F.3d 366, 368 (8th Cir. 1996) (*citing* Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995))." Burress v. Apfel, 141 F.3d at 881 n. 10. The ALJ "may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints . . . The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Id*. "The ALJ [is] not required to discuss methodically each Polaski consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints." McDade v. Astrue, 720 F.3d at 998 (*quoting* Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)).

The ALJ did consider the foregoing factors, although not by specifically naming the Polaski factors. Plaintiff reported that his hip, ankle, and back caused constant pain. He stated that he required pain pills just to function but that the pain pills make him sleepy. The ALJ found that plaintiff's impairments could be expected to cause the symptoms he alleged but determined that the plaintiff's claimed intensity, persistence, and limiting effects of the symptoms were not credible to the extent they are inconsistent with the residual functional capacity assessment performed by Dr. Entwistle after a records review. The ALJ noted that plaintiff worked

operating heavy equipment and helped his parents on the farm. The ALJ stated: "Although this work was just performed part-time and not at the level of substantial gainful activity, the performance of this job indicates a greater exertional capacity than that alleged by claimant." The ALJ further determined that plaintiff was not compliant with treatment, including missing therapy, engaging in drug seeking behavior, and failing to address chemical dependency issues. Finally, the ALJ found that plaintiff's receipt of unemployment benefits during the period of disability, which benefits are predicated on an oath that one is ready, willing, and able to work, factors against his allegation that he is unable to perform all work activity.

At the request of the Commissioner, a residual functional capacity assessment was prepared by Dr. Frederick Entwistle, who opined that plaintiff was capable of performing a range of medium work. That assessment, however, was based upon a records review only and was based upon records up to September 2010, only one month after plaintiff began treatment with Dr. Hansen. Dr. Entwistles' report did not include records for the year preceding the ALJ hearing. Dr. Tuttle affirmed Dr. Entwistle's report, again without seeing the plaintiff and presumably without reviewing medical records which were not yet in the Commissioner's record (as discussed below).

Plaintiff underwent a functional capacity assessment at the request of his attorney which was performed by physical therapist Brad Runia. Based upon those findings, the ALJ determined that plaintiff was capable of performing work at the sedentary level of physical activity. The ALJ ultimately found that plaintiff was capable of performing light, sedentary, unskilled work that exists in significant numbers in the national economy and he therefore is not "disabled."

As set forth previously, the ALJ "may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d at 1332. In the present case, the objective medical evidence does fully support the extent of plaintiff's claimed complaints of pain. The ALJ rejected plaintiff's subjective complaints based upon the fact that the residual functional capacity assessment performed by the Commissioner's expert did not support the plaintiff's claims of pain.

Further, the ALJ rejected plaintiff's subjective complaints of pain based upon the sporadic performance of part time work. The record is clear that work did cause plaintiff pain. "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful

15

activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Perkins v. Astrue, 648 F.3d 892, 900 (8th Cir. 2011) (*quoting* Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996)).

    The ALJ also rejected plaintiff's claimed debilitating pain because of his drug seeking behavior and failure to follow through with treatment. As the above background indicates, plaintiff did engage in drug seeking behavior in 2008 following his accident and subsequent ankle and hip surgeries. He was also not completely compliant with treatment until he began seeing Dr. Hansen in August 2009. Dr. Hansen organized a team approach to treatment and followed up with plaintiff every two to four weeks to ensure he was compliant. Dr. Hansen received copies of treatment records from the physical therapist, the mental health therapist, the pain counselor, and plaintiff's family physician and even obtained records from Blue Cross to track his prescription refills. The record is replete with evidence that, beginning in August 2010, plaintiff was compliant and, with one exception, no longer engaged in drug seeking behavior.

    The ALJ failed to consider any evidence from plaintiff's treating physicians which supported his subjective complaints of pain and failed to consider the medical records after August 2010. I find that there is not substantial evidence on the record as a whole to support the credibility determination made by the ALJ. The ALJ has never seen the plaintiff face to face.

## II. Weight of Agency's Expert Opinions.

    Plaintiff contends that the ALJ improperly gave greater weight to the opinions of the agency's reviewing experts over those of his treating doctors or examining experts. As set forth previously, the ALJ relied upon the plaintiff's proffered functional capacity assessment to determine his ability to perform sedentary work activities. Plaintiff contends that the ALJ failed to take into account both the side effects of his medication and his bouts of severe depression in determining whether he was in fact able to perform a full range of sedentary work.

    Plaintiff contends that his proffered functional capacity assessment, which was performed after actual physical testing as opposed to a mere records review, did not show that he could work on a substantial and continuous basis in a competitive work environment. Plaintiff contends that the ALJ's decision to "accord[] this evaluation limited weight" because "it was done at the behest of the claimant and his attorney in an effort to generate evidence for this appeal" was an abuse of discretion. It is important to note that, notwithstanding the ALJ's remarks, the ALJ relied upon that functional capacity assessment to determine that plaintiff was

capable of light work rather than relying upon the agency expert's assessment that plaintiff could perform a range of medium duty work.

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. *See Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. *See Stormo*, 377 F.3d at 806 ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(2). Thus, to the extent that the ALJ discredited [the treating physician's] conclusion that [plaintiff] could not work, he rightly did so.
>
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.' " *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir.2001) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (2000)).

Ellis v. Barnhart, 392 F.3d 988, 994-95 (8th Cir. 2005).

> "'[A] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Goff*, 421 F.3d at 790 (quoting *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir.2005) (internal marks omitted)). "'A treating physician's opinion does not automatically control, since the record must be evaluated as a whole.' " *Id.* (quoting *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir.1995) (internal marks omitted)). "An ALJ may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id.* (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir.2000)).

17

Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009).

> "[T]he hearing examiner need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." *Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir.1998) (internal quotations and citations omitted). Likewise, while a treating physician's opinion is generally entitled to "substantial weight," such an opinion does not "automatically control" because the hearing examiner must evaluate the record as a whole. *Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir.1999). "It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record." *Prosch v. Apfel*, 201 F.3d 1010, 1013-14 (8th Cir.2000). "Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Id.* at 1014 (internal quotations and citations omitted).
>
> "When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir.2000). "As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Id.* (internal quotations and citations omitted). This court, however, has recognized two exceptions to this general rule:
>
>> We have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician (1) where other medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.
>
> *Id.* (internal quotations, alterations, and citations omitted).

Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007).

The record shows that plaintiff experienced pain that was not resolved by medications and that he sought medical care as a result. His pain interfered with his ability to walk, stand, and operate equipment. There is no evidence in the medical records that the pain interfered with his ability to perform sedentary work and plaintiff apparently never attempted sedentary work.

**III. Appeals Counsel.**

Plaintiff contends that the appeals counsel failed to consider new evidence. The Appeals Council is required to "consider the additional evidence only where it relates to the period on or

18

before the date of the [ALJ] hearing decision." Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012) (quoting 20 C.F.R. § 404.970(b)).

The Appeals Council listed a number of medical records submitted but held that such records concerned the period of time after September 16, 2011, the date of the ALJ's decision. Plaintiff contends that the records summarized plaintiff's treatment before and up to the time of the hearing and are therefore proper. It is true that each record contains a history of plaintiff's condition and prior treatment but in that regard the records are cumulative of the actual records from the prior treatment. While the new records do show that plaintiff continued to treat for pain and had difficulty walking, they do in fact concern a time period after the ALJ's decision and were properly excluded by the Appeals Council.

The Appeals Council also listed records received that pre-dated the ALJ's decision, including Dr. Ostrander's report, the DePuy recall notice, letter from Dr. Hansen, a vocational evaluation conducted in August 2011, and over one hundred pages of medical records pre-dating the ALJ's decision. The Appeals Council did not specifically address those records but merely stated that the information provided does not provide a basis for changing the ALJ's decision.

> "When the Appeals Council denies review of an ALJ's decision after reviewing new evidence, 'we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination.'" *McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (quoting *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)).

McDade v. Astrue, 720 F.3d 994, 1000 (8th Cir. 2013). *See also*, Van Vickle v. Astrue, 539 F.3d 825, 828 & n. 2 (8th Cir. 2008) (additional evidence submitted to Appeals Council is considered in the substantial evidence equation).

The ALJ relied upon Dr. Entwistle's report to discount plaintiff's subjective complaints of pain and his treating physicians' reports of how that pain was interfering with plaintiff's ability to work. Dr. Entwistle's records review failed to include over a year of medical records. The record as a whole as submitted to the Appeals Council, which included a year of medical records and Dr. Ostrander's evaluation, does not support the ALJ's determination that plaintiff is not disabled.

**IV. Full Time Work.**

The ALJ also failed to specifically find that the plaintiff can work full time as required in Bladow v. Apfel, 205 F.3d 356 (8th Cir. 2000). In Bladow, the Eighth Circuit discussed Kelly v.

19

Apfel, 185 F.3d 1211 (11th Cir. 1999), which noted that it is the Commissioner's position that "only an ability [on the part of the claimant] to do full-time work will permit the ALJ to render a decision of not disabled." Id. at 1214.  Apparently, the Commissioner's policy interpretation was based upon Social Security Ruling (SSR) 96-8p, which provides that residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Bladow, 205 F.3d at 359.

Plaintiff testified that he had been working at most four hour days and 15 hour weeks. He stated that he would not be able to work an eight hour day with his standing and sitting limitations. In response to the ALJ's inquiry about whether he would be able to work a five day week without calling in sick, plaintiff stated that he would probably on average not be able to work two of the five days. The vocational expert, Dr. William Tucker, testified at the hearing that there are sedentary jobs in the regional and national economy that someone with plaintiff's limitations could perform. However, he also testified that absenteeism of one day per month would be all that would be tolerated for such employers. Even an employee needing an extra 15 minute break several times per week would not be tolerated. Further, he testified that plaintiff's use of OxyContin and Oxycodone would be a factor of concern for an employer. There was no finding in this case that the plaintiff could work an eight hour day five days a week as described in and required by Bladow.

## ORDER

Based upon the foregoing,

IT IS ORDERED that the decision of the Commissioner is reversed and remanded for a rehearing pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 30th day of March, 2015.

BY THE COURT:

*Charles B. Kornmann*

CHARLES B. KORNMANN
United States District Judge